(78 South. 856)

GERALD v. WALKER, Superintendent of Banks. (5 Div. 698.)

(Supreme Court of Alabama. May 9, 1918.)

GARNISHMENT ⊜63 — "PUBLIC OFFICER" — COMPENSATION.

A special agent appointed by the superintendent of banks in the liquidation of an insolvent bank under Acts 1911, p. 59, § 10, whose compensation is paid out of the funds of the bank, is a "public officer," within the meaning of the rule of law exempting his compensation from garnishment proceedings.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Public Officer.]

Appeal from Circuit Court, Chilton County; Leon McCord, Judge.

Action by Agnes Gerald, pro ami, against John Patton, Jr. Judgment for plaintiff. In aid of such suit a writ of garnishment was sued out against A. E. Walker, as Superintendent of Banks. From a judgment discharging the garnishee, the plaintiff appeals. Transferred from Court of Appeals under Acts 1911, p. 450, § 6. Affirmed.

On January 21, 1916, A. E. Walker, as superintendent of banks, assumed control of the affairs and assets of the Union State Bank, a corporation, doing business in Chilton county, Ala., for liquidation, as provided by statute; said bank being in a failing or insolvent condition. Upon assuming control of said bank's affairs, the superintendent of banks appointed John Patton, Jr., as his special agent in the liquidation of the affairs of said bank. Thereafter appellant in this cause obtained a judgment against said John Patton, Jr., in the sum of $917.60, with a waiver as to personalty; and, in aid of said suit, a writ of garnishment—the basis of this action—was sued out by the appellant, and directed to A. E. Walker as superintendent of banks, seeking to subject any assets in his hands, owing to said Patton, for the satisfaction of said judgment.

The said Walker filed a written answer, and also answered orally, disclosing the following facts: That he assumed control of said bank, as above set forth, and appointed said Patton as his special agent, as provided by statute in such cases. That Patton executed bond as required by the statute, and entered into the discharge of his duties under said appointment. Commencing on January 21, 1916, the agreement was that Patton was to receive the sum of $150 per month as compensation for such services. That, at the end of the month ending April 21, 1916, said salary was reduced to $100 per month, and on June 21, 1916, his salary was further reduced to $75 per month. By agreement with said Patton his salary was not to be drawn by him, or to be paid to him by Walker, until the salary arrangement had been confirmed by the circuit court, in equity, and if drawn before that time was to be at Pat-

ton's risk. The salary arrangement was confirmed on July 25, 1916, by the circuit court of Chilton county, sitting in equity. At the time of the service of the writ of garnishment in this case, the said Patton had retained out of the moneys collected by him his salary for the months of February, March, and April, 1916. That on April 18, 1916, Walker notified Patton of this garnishment. It is also shown that said Walker, in charge of said bank, had sufficient funds in his hands to pay the salary agreed to be paid Patton. That said Walker ascertained on or about August 1, 1916, that Patton was short in his accounts approximately $500—that is, he failed to account for that amount of money when relieved of his duties as agent. And, further, that he had made irregular offsets in the management of said trust to the extent of $1,300, but he did not know when these amounts became due to him, stating:

"That he could not say definitely as to that, his best recollection being that he was due some of the amounts (at the time of the service of the writ of garnishment in this case), to what extent, however, he could not tell."

In making the appointment of said Patton, as special agent, the superintendent of banks executed the commission under his official seal, in which commission it was expressly provided, as follows:

"I do hereby appoint John Patton, Jr., of Jemison, Ala., as my agent in the matter of liquidating the affairs of said Union State Bank; and I do hereby authorize him as my agent as aforesaid to perform such duties connected with such liquidation as I myself could do and perform in my own proper person."

Upon receiving the writ of garnishment, the superintendent of banks instructed Patton not to apply any of the funds that came into his hands, as such agent, towards the payment of his compensation or salary until the garnishment proceedings had been dismissed. Notwithstanding these instructions, Patton took from the funds coming into his possession the salaries named down to July 31, 1916, on which date he was formally notified by the superintendent of banks to discontinue his connection with the affairs of said bank. The accounts of said Patton between July 31, 1916, and August 7, 1916, were checked and audited, and he was found to be indebted to the superintendent of banks in the amounts as above stated.

There was judgment discharging the garnishee, and the plaintiff prosecutes this appeal.

Lawrence F. Gerald, of Clanton, and Jones, Thomas & Field, of Montgomery, for appellant. Coleman & Coleman, of Birmingham, for appellee.

GARDNER, J. By this proceeding, appellant seeks to subject the salary alleged to be due a special agent, under appointment of the superintendent of banks in the liquidation of the affairs of an insolvent bank, to the satisfaction of a judgment obtained by said appellant against such special agent. As to whether or not the character of funds in the hands of the superintendent of banks relieves such official, under the circumstances of this case, from subjection to garnishment, and is not included within the provisions of section 4309 of the Code of 1907 (Pruitt v. Armstrong, 56 Ala. 306), is a question which is left without determination, as the conclusion we have reached renders a decision of this question unnecessary. As was said by this court in Pruitt v. Armstrong, supra:

"It has * * * been uniformly decided that the salary, fee, or the compensation of public officers is not subject to garnishment."

The rule is rested upon the very sound principle that it is contrary to public policy to permit governmental affairs to be thus interfered with by creditors of an individual who has been selected for the performance of service for the public. The opinion in the above-cited case quotes the following with approval from the Tennessee court (Bank of Tennessee v. Dibrell, 3 Sneed [Tenn.] 379):

"Every consideration of policy would forbid it. No government can sanction it. It would be very embarrassing generally, and, under some circumstances, might prove fatal to the public service to allow the means of support of the government to be intercepted in the hands of distributing agents. If the funds of the government, thus specifically appropriated for the support and maintenance of its agents were allowed to be divested by process of attachment in favor of creditors, or otherwise, from their legitimate object, the functions of the government might be suspended. The state might be thus deprived of the services of her most valuable citizens."

In the case of Mayor, etc., v. Rowland, 26 Ala. 498, the court said:

"The city corporation, which is a government for the city, invested with certain attributes of sovereignty delegated to it by its charter, is entitled to fill its offices by a selection of suitable persons from among the whole community. This privilege would exist but in name if those who depend upon their salaries for a livelihood could be deprived of such salaries by garnishment, and thus cut off from the means of subsistence. The result would be that only those who were free from debt, or who could subsist without their salaries, could fill such offices, and the public service might suffer from want of persons to accept or hold them."

It remains, therefore, to be determined whether or not the debtor, Patton, in the instant case, appointed as special agent by the superintendent of banks in the liquidation of affairs of the Union State Bank, was a public officer within the meaning and spirit of this well-recognized rule.

The law creating a banking department for the state of Alabama, and through such department supervising and examining the banks of this state, was enacted by Acts 1911, p. 50. The constitutionality of many of the provisions of this act was unsuccessfully attacked in McDavid v. Bank of Bay Minette,

193 Ala. 341, 69 South. 452. The McDavid Case disclosed that the business of banking is considered by all. the authorities as a matter of great public concern, and that "on account of the nature of the banking business and the great public interests to be protected by wise legislation concerning the same, it is of such a character as to come within the internal police powers of the state." We direct attention to this fact as in answer to the argument of counsel for appellant to the effect that the special agent in performing the services in the liquidation of the affairs of the Union State Bank was engaged merely in a matter concerning private individuals, and not in a matter in which the public welfare was involved. As was said by one of the authorities cited in the McDavid Case, supra:

"Money is said to be the very lifeblood of the nation. The banking business has grown to be a part and parcel of our financial system, and it is so regarded by both the federal and state governments."

Therefore the state at large is interested not only in wise legislation regulating the banking business, but also in the proper administration of the affairs of an insolvent bank, the control of which has been assumed by the state banking, department.

Appellant's debtor, Patton, received his appointment under the provisions of section 10 of the above-cited act of 1911, which, so far as here pertinent, reads as follows:

"The superintendent may, under his hand and official seal, appoint an agent to assist him in the duty of liquidation and distribution of the assets of any bank taken possession of by him under the provisions hereof, the certificate of appointment to be filed in the office of the superintendent and a certified copy in the office of the probate court in the county in which the principal office of such bank was located, and such special agent shall receive a salary not exceeding $200 per month for the time he is actually engaged in assisting and liquidating the affairs of the bank. The superintendent may authorize such agent to perform such duties connected, with such liquidation and distribution as the superintendent himself could in person do and perform. * * * The superintendent shall require from the special agent appointed by him and from such assistants as will have charge of any of the assets of the bank such security for the faithful discharge of their duties as he may deem proper."

The act further provides that the compensation of · such special agent shall be fixed by the superintendent, subject to the approval of the court, and in no event to exceed the sum of $200 per month, to be paid out of the funds of such corporation or individual banker in the hands of the superintendent, and shall be a prior charge or lien on the assets of such corporation or individual banker. Under the provisions of said act, the superintendent also has authority to appoint bank examiners, as well as an office assistant to aid him in the discharge of his duties. That said superintendent of banks is a public officer is, of course, too clear for discussion.

The act specifically provides that the superintendent in the appointment of such special agent may authorize such agent to perform such duties connected with such liquidation and distribution as the superintendent himself could in person perform, and such was, in fact, the express stipulations contained in the commission issued to Patton in the instant case. Patton executed bond for the faithful discharge of his duties, as was authorized by said act, and in the performance of his duties therefore stood in the shoes of the superintendent, with the same authority in the liquidation of the affairs of said bank as was possessed by the superintendent himself.

In Andrews v. State, 78 Ala. 483, it was held that where one is deputized by the sheriff to make an arrest in a particular case only, yet he was an officer of the state within the meaning of the statute, making it a violation of the law for one to willfully and knowingly resist such officer of the state. In discussing the question, the court said:

"We are satisfied that the special deputy was an officer of the state, within the meaning of this statute. The law makes it the duty of the sheriff to have one deputy, and authorizes him to have as many as he may think proper. Code, § 729. The office is a mere statutory creation, and not a constitutional one. After his ·appointment, he had the authority to execute the process by arresting the defendant, and his duty was commensurate with his authority. Pro hac vice, he was an officer, within the generic meaning of the term, because he was executing an agency of the state under the authority of a public law."

So here, also, while Patton is designated as special agent, yet he may with equal propriety be called a special deputy of the state, supervising in the matter of the liquidation of the affairs of said Union State Bank.

There have been numerous definitions of the words "public officer," but we apprehend that the significance of these words does not depend so much upon the abstract force of the words themselves as upon the relation in which they are found. State ex rel. Winter v. Sayre, 118 Ala. 1, 24 South. 89. For this reason, therefore, it is not practicable to ' lay down any· definition of the words "public officer" to be applied in all cases; but their meaning must be left to be determined in the light of the particular statute, constitutional provision, or rule of law under consideration in each case. This is emphasized by the recent cases of Harrington v. State, 76 South. 422,[1] and State v. Sanders, 187 Ala. 79, 65 South. 378, L. R. A. 1915A, 295, where numerous authorities are cited. In the Harrington Case, speaking of this question, the court said:

"The words 'office' and 'officer,' as used in certain statutes or constitutional provisions, may include certain positions, places, and persons, which would not be embraced within the meaning of the same words used in other statutes or other constitutional provisions. This difference of meaning and sense in which these

[1] 200 Ala. 480.

words are used has been frequently pointed out by this and other courts. * * * On account of this variety of meanings attaching to the words, 'office' and 'officer,' as used in various written laws, the adjudicated cases do not always, nor even often, furnish safe guides by which to determine with absolute certainty whether or not a given employment is an office within the meaning of a given statute or other written law. Every case must of necessity be determined by consideration of the particular facts and circumstances involved."

It has been held in England that:

"Every man is a public officer who hath any duty concerning the public; and he is not the less a public officer, where his authority is confined to narrow limits, because it is the duty of his office, and the nature of that duty which makes him a public officer, and not the extent of his authority." Throop on Public Officers, § 2.

In section 10 of the above-cited text-book will be found noted numerous instances, with citations of authorities, where the public servant has been held to be a public officer within the meaning of the particular statute there under consideration. In section 1 of Mechem on Public Officers is the following:

"A public office is the right, authority, and duty, created and conferred by law, by which for a given period, either fixed by law or enduring at the pleasure of the creating power, an individual is invested with some portion of the sovereign functions of the government, to be exercised by him for the benefit of the public. The individual so invested is a public officer."

A case very much in point is Commonwealth v. Evans, 74 Pa. 124, referred to in section 8 of Throop on Public Officers, wherein it was held that a person appointed by the governor, pursuant to a joint resolution of the Legislature, as special agent of the state to collect certain claims of the state against the United States, and who was not required to take an official oath, was a public officer. In discussing the question, the court said:

"It is quite unnecessary to discuss the authorities which have been cited upon this point. None of them bear any resemblance to this case, except, perhaps, United States v. Maurice, 2 Brock. 96 [Fed. Cas. No. 15,747], and that, we think, sustains the conclusion at which we have arrived. It was there held that an agent for fortifications, appointed under the army regulations, which had received the sanction of Congress, was a public officer from whom the government had a right to exact an official bond with sureties, and that such bond was therefore a valid obligation. The appointment there as here was for an indefinite period. Nor does it seem to us to distinguish this case from that, that this appointment was to collect a single claim, or rather a set of claims against a particular debtor. No one can doubt that collectors of public taxes are within the letter of the exception of the act of 1842. Suppose a special tax laid for a temporary purpose, is it susceptible of any more doubt that a person appointed by authority of law to collect such tax—call him special collector or special agent—would be equally within the exception, and moneys collected by him be 'moneys collected by a public officer'? Can it make any difference that a person is commissioned by the Governor as a general agent to collect all claims of the commonwealth, or as a special agent to collect only one particular claim? We think not."

In the case of Skewes v. Tenn. C. & I. Co., 124 Ala. 629, 27 South. 435, 82 Am. St. Rep. 214, one Harney contracted with the city of Bessemer for the privilege of doing the sanitary work of the city, and paid the city $25 per month as consideration for the contract. It was held that Harney was an employé of the city in the administration of its affairs; the court saying:

"The relation of Harney to the municipality of Bessemer was that of an employé in the administration of the affairs of the city, whose wages, on the grounds of public policy, would be exempt from the process of garnishment for the same reason that the wages of police officers of the city would be exempt." ·

In Lacey v. State, 13 Ala. App. 212, 68 South. 706, it was held that clerks in the convict department, appointed by virtue of section 6485 of the Code of 1907, are officers of the state within the meaning of section 6838 of the Code of 1907, as amended by Acts 1907, p. 162, punishing embezzlement of public officers. Several authorities are cited in that opinion which are of interest in this connection. In State v. Stanley, 66 N. C. 59, 8 Am. Rep. 488, cited in Andrews v. State, supra, it was said:

"A public office is an agency for the state, and the person whose duty it is to perform this agency is a public officer. This we consider to be the true definition of a public officer in its original broad sense. The essence of it is the duty of performing an agency, that is, of doing some act or acts, or series of acts, for the state. * * * This definition also excludes the idea that a public office must have continuance."

The functions of the state banking department relate to two distinct classes of banks, one of them engaged in business as going concerns, requiring examination and supervision; the other, insolvent banks which the interest of the public requires that they be taken over by the superintendent of banks for the purpose of liquidation, and the protection of creditors and stockholders.

Under the terms of the statute, the superintendent of banks is authorized to appoint examiners, whose salaries are fixed, and whose duties relate to the examination of various banks. It could hardly be contended that the salaries of these bank examiners could be made the subject of garnishment proceedings under the uniform decisions of this court, and that they are public officers within the protection of this rule can hardly be questioned. Under the provisions of the same act, the superintendent is authorized to appoint a special agent, having the same authority as the superintendent himself, to take charge of and liquidate the affairs of an insolvent bank; the salary to be fixed by the superintendent, but not to exceed the sum of $200 per month. And such special agent is required to make bond for the faithful performance of such duties.

If the examiner appointed by the superintendent is a public officer within the protection of this rule of law, we are unable to see any clear reason why the special agent, who

in the instant case was in fact a deputy of the superintendent, is not also entitled to the same protection upon the same ground of public policy. That this special agent was in the exercise of the duties for and on behalf of the state is to our minds quite clear. Deriving his authority from appointment by the officer specially authorized by the act of the Legislature, he is in a sense, in liquidating the affairs of the insolvent bank, an arm of the state, engaged in most important services. In such work it is highly essential that the services of the best man obtainable under the circumstances should be secured, and that,in such selection the appointing officer of the state should be unhampered by any consideration of garnishment proceedings.

We are therefore of the opinion that the special agent, Patton, was a public officer within the meaning of the rule of law exempting his compensation from garnishment proceedings, because to subject the same would be contrary to the public policy of the state.

We have carefully examined the case of Mitchell v. Nelson, 49 Ala. 88, cited by counsel for appellant, but we are not impressed that this authority militates against the conclusion here reached. Nor are we persuaded of the incorrectness of our conclusions by the case of Conrey v. Copland, 4 La. Ann. 307, which dealt with a certain act of the state of Louisiana.

It results that the judgment of the court below, discharging the garnishee, was, in our opinion, correct, and will be here affirmed.

Affirmed.

ANDERSON, C. J., and McCLELLAN and SAYRE, JJ., concur.